THE GROTON SAVINGS BANK

*v.*

WILLIAM BATTY and others.

1. The principle that the possession of land is notice to others of the possessor's title, is intended to protect only equitable rights, and not to cover the possessor's fraud, or to protect him where he is without equity.

2. As against an innocent mortgagee, notice from the possession of lands cannot be set up by an occupant who was insolvent when he placed the title in the name of the mortgagor, and knew, soon after the time of the giving of the first of the two mortgages, that it had been given, and did not notify the mortgagee of his claims, but kept silent and permitted the mortgagor to borrow more money of the mortgagee on a second mortgage of the property, whereas if he had notified the mortgagee of his claim when he first was made aware of the existence of the first mortgage, the mortgagee might have collected the mortgage debt of the mortgagor and would have not made the second loan on security of the mortgaged premises.

Bill to foreclose. On final hearing on pleadings and proofs.

*Mr. G. Collins,* for complainants.

*Mr. S. B. Ransom,* for defendants Lathrop and wife.

THE CHANCELLOR.

The bill is filed to foreclose two mortgages given to the complainants, a Connecticut savings bank, on a lot of land in Jersey City: one by John Batty and William Batty, dated November 1st, 1863, to secure the payment of $1,000, in one year, with interest; and the other by William Batty (to whom, in 1865, John Batty released his interest in the property), dated October 1st, 1869, to secure the payment of $2,500, in one year, with interest. Sylvanus Lathrop and his wife were made defendants, because at the time of beginning the suit they were in possession of the mortgaged premises (on which there is a dwelling-house in which they resided), and claimed some title thereto or interest therein. The title to the property was never in either of them.

The premises are part (eighteen feet front by ninety feet deep) of a lot of twenty-five feet front by ninety feet in depth, which was bought, as alleged in the answer, by Mrs. Lathrop, in 1852, from John B. Coles and others. She, however, never took the title. Her husband built the house with his

own money, at a cost of $3,000. In 1856, they caused the vendors to convey the property, in fee simple, to James S. Bishop, who was to hold it as security for the repayment to him of the sum of $1,100 lent by him to them, $600 of which were used for the payment of the purchase-money of the lot. In August, 1858, Bishop requiring repayment of that money, it was paid to him by the Batties, on his conveying the property to them in fee. In 1853, Mrs. Lathrop purchased of the same vendors a lot of land adjoining the one above mentioned, and, in 1862, she and her husband conveyed it to the Batties for the consideration, as stated in the deed, of $1,200. It was then vacant. Upon this lot and the unoccupied seven feet of the lot first mentioned, the Batties built two dwelling-houses. One of them they sold, in 1865, to Oramel Whittlesey, for $6,000, and the other was sold, in 1867, by William Batty (John having, on the same day the conveyance to Whittlesey was made, released to William all his interest in the remainder of the property and in the first-mentioned lot), to Stephen Mueller for the consideration of $6,660, according to the deed. The deed bears date on the 14th of March, 1867. The Batties furnished all the money for the building of those houses. Lathrop, who was a carpenter, did some work to them, which he estimates as of the value of about $800. The defence set up in this suit by the Lathrops is, that the conveyances to the Batties, who were Mrs. Lathrop's brothers, were merely by way of mortgage, to secure the repayment of moneys advanced by them, to repay Bishop and to build the houses which were sold to Whittlesey and Mueller, respectively; and that it was agreed, between the Lathrops and the Batties, that the latter should re-imburse themselves out of the proceeds of the sale of the property on which those houses were to be built; that that property was sold and the sale produced enough money fully to repay the Batties; and that, though the legal title to the mortgaged premises was in the Batties when the complainant's first mortgage was made, and in William Batty when the second was given, the Lathrops were in possession

of the property; and that such possession was notice to the complainants of the equitable rights of Mrs. Lathrop in the property.

Though the lot of which the mortgaged premises was part was bought by Mrs. Lathrop, she paid no money of her own for it, but borrowed $600 from Bishop (the repayment of which was secured by the deed from Coles and others to him) to pay the purchase-money. She had no separate estate. Her husband, after the purchase of the lot, and before the title passed from the vendors, erected the house upon the property with $3,000 of his own money. The lot was bought in the fall of 1852 or 1853. The house was finished about the 1st of April, 1854, for he, with his family, then moved into it. He appears to have been unable to pay his debts, for there appear of record against him judgments recovered in the circuit court of Hudson county, early in 1855, for comparatively small sums. One was recovered on the 29th of January, for $176.74; another on the 12th of February, for $264.74, and another on the 21st of that month, for $79.69. His insolvency appears to have continued ever since. In May, 1856, a judgment was recovered against him in that court for $894.60, and in August following another for $283.14. On the 30th of January, 1857, another judgment was recovered against him, and it appears that in March of that year he was arrested on civil process and gave bond in the penalty of $1,400 conditioned to apply for the benefit of the insolvent laws, and he admits that the claim on which he was so arrested has not been paid.

In his testimony, though he says he was not in pecuniary trouble when the deed from Bishop to the Batties was given; that he had got over his troubles—he also says he does not know when he failed; that he had failed before that time; that he had never got out of his trouble, and that he has never settled with his creditors. He also says, that since 1857 he has had no means except what he has earned from day to day, and that there are judgments against him.

The legal title to the mortgaged premises was conveyed to Bishop, and by him to the Batties, by absolute deed, by the direction of the Lathrops.    Though the Lathrops insist that the conveyance was merely by way of mortgage, with a verbal agreement for reconveyance on the payment of the money lent and advanced by the Batties, William Batty (John appears to be incapacitated by disease from testifying) swears that there was no understanding or agreement that the Batties should hold the property as security, but that the agreement was that they would reconvey on being repaid all moneys paid out by them for all purposes in respect of the property, before they should convey to any one else.    He further swears that he and his brother bought the property absolutely and unconditionally for the amount of the consideration, $3,000 (which he says was its full value), expressed in the deed from Bishop, and paid it all; that the first payment was to Lathrop, $1,000 to $1,500; subsequently taxes in arrear, water rents and assessments, and afterwards, from time to time, the balance; so that they paid the full amount agreed upon, $3,000.    He swears that they paid to Lathrop and his wife all of the money except taxes, water rents and assessments, and that part of the taxes, water rents and assessments was paid by him through Lathrop and his wife.

It may here be remarked that though Lathrop swears that he himself paid all the taxes upon the property with his own money, it appears that in fact he did not do so.    He is able to produce but a single receipt, and that is for the taxes of 1866, which were not paid until 1868.    The property was sold for the taxes of the years 1856, 1857, 1858, 1859, 1860, 1862, 1863 and 1865, and redeemed by the Batties, or one of them.    The Batties appear to have paid the taxes for 1867, 1868 and 1869.    Lathrop admits that he never paid any of the water rents, and assigns as his reason want of money. The evidence of the alleged agreement to redeem depends entirely on the testimony of Lathrop.    His wife knows nothing about it.    She, indeed, knows but little about the subject of the controversy.    She says she forgets whether

she knew or did not know, at the time when it was given, that Bishop made the deed to the Batties, her brothers; that she never bothered her head about it; that Lathrop told her he was going to make a deed, but she never bothered herself about the business; that her husband always transacted her business, and was her agent in everything, and that he bargained for the lot when it was bought. She cannot tell how much she borrowed from Bishop. She says she does not know what the house cost, nor how much the Batties advanced to her husband, nor how much they lent or advanced to her, nor for what purposes the money was advanced.

The agreement to redeem, on which the claim of Mrs. Lathrop rests, being sworn to by Lathrop alone, and denied by Batty, the fact that the consideration expressed in the deed is $3,000 may be adverted to, and also the fact that in 1865 the Batties were permitted by the Lathrops to sell and convey as their own property part of the lot conveyed to the Batties by Bishop. It may also be remarked that neither party kept any account in reference to the property. There seems to be great reason to believe that, admitting the claim made by the Lathrops, that the deed to the Batties was merely conditional, recourse was had to absolute deeds to Bishop and the Batties, instead of mortgages, with a view to screening the property from Lathrop's creditors, and with the design of thus concealing what they now insist was the true ownership of the property, and so misleading the public.

The principle (that the possession of land is notice to others of the possessor's title) which the Lathrops invoke, is intended for a shield to protect the equitable rights of those who are entitled to the consideration of equity. It will not be available as a cover of fraud; nor will it be applied against equity. Said the court in *Cook* v. *Travis*, 22 *Barb.* 338, 359: "It is a general rule that the possession of land is notice to others of the possessor's title. But it is not universally true; it is merely an inference; it may arise

in some cases, it may be repelled in others, and in others it may be restricted to some particular claim. The rule, like all rules of circumstantial evidence, must be governed by the particular circumstances of each case, and have a reasonable operation." In the same case, on appeal (20 *N. Y.* 400, 402), the court enunciated the doctrine as follows: "It is quite true, generally, that the law regards the actual occupancy of land as equivalent to notice, to all persons dealing with the title, of the claim of the occupant. But this is not an absolute proposition which is to be taken as true in all possible relations. The circumstances known may be such that the occupancy will not suggest to a purchaser an inquiry into the title or claim under which it may be held; and when the inquiry may be omitted in good faith and in the exercise of ordinary prudence, no one is bound to make it. Possession out of the vendor and actually in another person, only suggests an inquiry into the claim of the latter. Ordinarily, that inquiry should be made, because it evinces bad faith or gross neglect not to make it. But the question in such cases is one of actual notice, and such notice will be imputed to a purchaser only where it is a reasonable and just inference from the visible facts. He cannot willfully close his eyes and then allege good faith; nor can he pause in the examination where the facts made known to him plainly suggest a further inquiry to be pursued."

In *Williamson* v. *Brown*, 15 *N. Y.* 354, 362, the doctrine is thus laid down: "Where a purchaser has knowledge of any fact sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed either to have made the inquiry and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim to be considered as a *bona fide* purchaser. This presumption, however, is a mere inference of fact, and may be repelled by proof that the purchaser failed to discover the prior right."

In *Fassett* v. *Smith*, 23 *N. Y.* 252, it was held that the possession by a husband of his wife's real estate is to be taken as her possession, so as not to put a purchaser on inquiry as to the rights of a third person, of whom the husband, to cover his own fraud, took a lease, unknown to the purchaser.

A vendor who, after conveyance of land, remains in possession, will not be protected by his possession in a secret trust existing in his favor in the property in the hands of the grantee; for, by his deed, he has declared to the public that he has no right to the possession. *Van Keuren* v. *Central R. R. Co. of N. J.*, 9 *Vr.* 165; *New York Life Ins. Co.* v. *Cutler*, 3 *Sandf. Ch.* 176; *Newhall* v. *Pierce*, 5 *Pick.* 450; *Scott* v. *Gallagher*, 14 *Serg. & R.* 333; *McCulloh* v. *Cowher*, 5 *Watts & S.* 427. So, too, one who gives out to the public, for purposes of concealment of his interest in the land, that another person is the absolute, unconditional owner of it, in order that it may be believed that he himself has no title or interest therein, will be held, in equity, to the consequences of his action as against innocent purchasers for value.

In this case, the deed to Bishop and the deed to the Batties, were recorded when the first mortgage to the complainants was given. It is clear, from the testimony of the Lathrops themselves, that they knew of the existence of that mortgage as early as about the month of October, 1866. Lathrop, speaking of a conversation which, he says, took place about April, 1867, testifies on the subject as follows: " I said (to William Batty), 'you have a mortgage to the savings bank for the $1,100 which you paid out to Bishop and Coles.' He said, 'yes.' I can't tell where I heard it from; I don't know but he told me himself; I know I asked him about it at that time." And, again, he says that John Batty's wife told his wife of the giving of the mortgage, as long as six months, he thinks, before that conversation. Mrs. Lathrop testifies that she knew that her brothers gave a mortgage of $1,000 to the Groton Savings

Bank, but cannot remember whether she knew that it was to be given before it was given; that she learned it from her husband.

The Lathrops did not, however, give any notice to the complainants that the Batties had no right to give the mortgage, nor that it was in derogation of the rights of Mrs. Lathrop. Lathrop says the reason was, he did not know it was his duty to do so. Had he informed them of his wife's claim upon the property, they might have recovered the money, for the bond was due, and the Batties, according to Lathrop's testimony, were men of property. He says he "understood that they were. well off; that they owned a good deal of shipping, steamboats, &c." Besides, when the Lathrops first heard of the mortgage, only one of the two houses had been sold, and it was not until about five months afterwards that the other was sold. It was sold to Mueller, for $6,660. Not only was the title to that property in William Batty, by conveyance from the Lathrops to him and his brother, and release from the latter to him, but he had sufficient beneficial interest in it to have secured the complainants from loss on their $1,000 mortgage. Had they been notified, the complainants would not have made a further loan to William Batty on the security of the property.

The second mortgage, which was for $2,500, was not taken until 1869. Under the circumstances, it was the duty of the Lathrops to notify the complainants of their claim, after it had come to their knowledge that a mortgage had been given to them by the Batties upon the property. They, according to their own statement, had given to the Batties the means of deceiving the complainants, by professing to be the absolute, unconditional owners of the property. They kept silent as to their claim when they should have spoken; equity will not hear them when they assert it now against those whom their silence has misled.

Not only did they not notify the complainants, but they did not even protest to the Batties, or either of them, against their action in giving the mortgage, nor expostulate

Lehigh Valley R. R. Co. *v.* McFarlan.

with them on that account, but, on the other hand, they acquiesced. And again, although, in April, 1867, Lathrop, as he testifies, in vain endeavored to obtain an account from and settlement with William Batty, who was then, as Lathrop insisted, overpaid, yet it was not until 1875, eight years afterwards, that he filed a bill in this court to obtain a reconveyance of the mortgaged premises. For all that time (and within it the complainant's second mortgage was taken) he permitted William Batty to remain the absolute and unconditional owner of record of the mortgaged premises; so continuing his power to obtain loans, on the security of the property, from unsuspecting lenders.

The Lathrops, for purposes of their own, clothed the Batties with the garb of absolute, unconditional ownership, and, as between them and an innocent party induced to act on this representation, the loss occasioned thereby must, under the circumstances, fall on them. There will be a decree for the complainants for the amount of both mortgages and the interest thereon.